T.C. Memo. 2012-233

UNITED STATES TAX COURT

ATLANTIC COAST MASONRY, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22515-10.                          Filed August 13, 2012.

James P. Dempsey (an officer), for petitioner.

Jeremy H. Fetter and Shelley Turner Van Doran, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, Judge:  Respondent determined that for purposes of Federal

employment taxes, the individuals (corporate officers, masons, and laborers) listed

in a table attached to a notice of determination of worker classification (notice of

determination) should be legally classified as petitioner's employees and thus

[*2] determined deficiencies in, additions to, and penalties with respect to

petitioner's Federal employment and unemployment taxes as follows:

| Period ended | Type of tax[1] | Amount | Additions to tax Sec. 6651(a)(1) | Sec. 6651(a)(2) | Penalty Sec. 6656 |
|---|---|---|---|---|---|
| 3/31/04 | FICA, ITW | $36,356.79 | $8,180.28 | $9,089.20 | $917.92 |
| 6/30/04 | FICA, ITW | 38,521.34 | 8,667.30 | 9,630.34 | 972.57 |
| 9/30/04 | FICA, ITW | 46,714.36 | 10,510.73 | 11,678.59 | 1,179.42 |
| 12/31/04 | FICA, ITW | 30,239.19 | 6,803.82 | 7,559.80 | 738.58 |
| 12/31/04 | FUTA | 9,550.36 | 2,148.83 | 2,387.59 | 955.04 |
| 3/31/05 | FICA, ITW | 37,987.05 | 8,547.09 | 9,496.76 | 959.08 |
| 6/30/05 | FICA, ITW | 18,358.09 | 4,130.57 | 4,589.52 | 463.50 |
| 9/30/05 | FICA, ITW | 46,040.36 | 10,359.08 | 11,510.09 | 1,162.41 |
| 12/31/05 | FICA, ITW | 46,421.56 | 10,444.85 | 11,605.39 | 1,172.03 |
| 12/31/05 | FUTA | 16,628.90 | 3,741.50 | 4,157.23 | 1,662.89 |
| 3/31/06 | FICA, ITW | 48,532.96 | 10,919.92 | [2] | 1,225.34 |
| 6/30/06 | FICA, ITW | 33,137.05 | 7,455.84 | [2] | 836.63 |
| 9/30/06 | FICA, ITW | 20,284.23 | 4,563.95 | [2] | 512.13 |
| 12/31/06 | FICA, ITW | 65,565.95 | 14,752.34 | [2] | 1,509.71 |
| 12/31/06 | FUTA | 12,455.43 | 2,802.47 | [2] | 1,245.54 |

[1]FICA refers to the Federal Insurance Contributions Act, secs. 3101-3128. ITW refers to the statutory income tax withholding required pursuant to sec. 3402(a). FUTA refers to the Federal Unemployment Tax Act, secs. 3301-3311.

[2]The amount of the sec. 6651(a)(2) addition to tax could not be computed at the time the notice was issued.

**[*3]**   In its posttrial brief petitioner concedes that for purposes of Federal employment taxes its two corporate officers should be legally classified as employees.  Thus, the issues remaining for decision are:  (1) whether the masons and laborers listed as workers on the notice of determination should be legally classified as employees as respondent maintains or as independent contractors as petitioner maintains; and (2) if the masons and laborers listed as workers on the notice of determination should be legally classified as employees, then (a) whether petitioner is entitled to relief from employment taxes pursuant to the Revenue Act of 1978, Pub. L. No. 95-600, sec. 530, 92 Stat at 2885 (section 530); (b) whether petitioner is liable for an addition to tax for failure to timely file returns pursuant to section 6651(a)(1) for the tax periods involved; (c) whether petitioner is liable for the addition to tax for failure to timely pay pursuant to section 6651(a)(2) for the tax periods involved; and (d) whether petitioner is liable for the penalty for failure to timely deposit tax pursuant to section 6656 for the tax periods involved.

All Rule references are to the Tax Court Rules of Practice and Procedure, and unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times.

**[*4]** FINDINGS OF FACT

Some of the facts are stipulated and are so found.  We incorporate by reference the stipulation of facts and the attached exhibits.

Petitioner was incorporated in 2001.  It elected to be treated as a subchapter S corporation for Federal income tax purposes.  At the time petitioner filed its petition, its principal place of business was in Florida.  During all relevant times petitioner acted as a subcontractor providing masonry services.  Petitioner had gross revenues in excess of $1 million for each of the 2004, 2005, and 2006 calendar years.

Petitioner had two shareholders/corporate officers, Blanche Dempsey and James Dempsey (Ms. Dempsey and Mr. Dempsey, or collectively Dempseys).  The Dempseys each held a 50% interest in petitioner.  Ms. Dempsey served as its president.  She performed bookkeeping and clerical services for petitioner.  She possessed signature authority on petitioner's checking accounts.

Mr. Dempsey is a licensed mason and has worked in the masonry industry since 1978.  He served as petitioner's vice president, procuring all masonry work it performed and overseeing its day-to-day operations.

Mr. Dempsey submitted proposals for masonry jobs on behalf of petitioner to general contractors for construction projects.  The proposals included in the

[*5] record provide that petitioner would furnish all labor, materials, equipment, and supervision necessary to complete the job. Mr. Dempsey negotiated and executed the subcontract agreements (contracts) governing the work to be performed by petitioner. He issued invoices to the general contractors. The general contractors paid these invoices via checks made out to petitioner. The checks were then either deposited into petitioner's bank account or, more often, cashed at either petitioner's bank or at a local check cashing company. During the years involved all checks that were cashed on behalf of petitioner were cashed by either Mr. Dempsey or Ms. Dempsey.

After commencing a project, Mr. Dempsey made purchasing decisions on behalf of petitioner with respect to the materials needed for the job, including the concrete and blocks to be used as well as a fastening gun and quantities of sand. If required, Mr. Dempsey rented cranes and forklifts on behalf of petitioner. The contracts with the general contractors provided that the materials so paid for belonged to the general contractor. Petitioner was reimbursed for the cost of the materials and lease expenses.

Mr. Dempsey did not personally manage petitioner's construction projects. Rather, he contracted with others to supervise or be the foreman of the job. One

[*6] such supervisor was William McNally.[1]  Mr. McNally generally worked exclusively for petitioner, although in 2004 he worked for others as well.  At the start of each job Mr. Dempsey would tell Mr. McNally:  "this is how much money that we have in this job, and do you think you can do it with your manpower?"  If the answer was yes, they would shake hands (there were no written contracts) and Mr. McNally would begin to organize the project.  Mr. McNally's compensation, consisting of a base amount and a percentage of profits, was paid in cash.  Mr. Dempsey testified that Mr. McNally and the other supervisors "would make money based on their productivity, and we would split this job throughout the whole job.  If the production was good, we made money, and if the production was bad we didn't."  Mr. McNally received no fringe benefits from petitioner, and petitioner did not pay workers' compensation insurance premiums on his behalf.

Because petitioner had no full-time workers other than the Dempseys, Mr. McNally's first responsibility was to find masons and laborers.  These individuals were hired on a per-job basis.  The record reveals that 30 masons and laborers

---

[1]Mr. McNally was not classified as petitioner's employee by respondent in the notice of determination.  Mr. McNally testified that he "worked with Mr. Dempsey as an independent contractor" and was "paid on a 1099 and filed * * * [his] taxes like that."

[*7] worked for petitioner in 2004, 66 worked for it in 2005, and 46 worked for it in 2006.

Mr. McNally kept a telephone list of the masons and laborers with whom he had worked and would contact those individuals whenever he needed help. Often the masons and laborers Mr. McNally contacted would bring friends or relatives to the jobsite.

Mr. McNally supervised the masons and laborers. He oversaw the number of bricks each mason laid per day and was responsible for the completion of the project on schedule. Mr. McNally had the authority to hire and fire masons and laborers at will. Mr. Dempsey could also fire anyone, including Mr. McNally, working on the project.

Mr. Dempsey gave Mr. McNally the plans of the building project and instructed him that "the building had to go up in a certain way, and I [Mr. McNally] made sure that was done on a daily basis". Mr. McNally liaised with the general contractor and was authorized by Mr. Dempsey to change, if necessary, specifications that had been agreed upon by petitioner and the general contractor.

[*8] Mr. McNally brought in only experienced individuals. The masons and laborers brought their own tools with them, including trowels, levels, additional wheelbarrows, and tape measures.[2]

At the commencement of the project Mr. Dempsey would visit the worksite to confirm that everything was in place, including the blocks, the cement, and the equipment. He would meet the masons and laborers and tell them what was to be done and how they would be paid and provide to them instructions relating to the masonry work.

The masons and laborers worked an eight-hour day, but they were paid on a piecework basis. In other words, they were paid according to the number of blocks, bricks, or cubic yards of cement laid. Mr. Dempsey established the amount to be paid per block, brick, or cubic yard. The masons and laborers were paid weekly by Mr. Dempsey, who handed each of them envelopes with the appropriate amount of compensation in cash or delivered the envelopes to Mr. McNally for distribution to the workers. Petitioner maintained cash logs that recorded how much money each mason or laborer received as well as how much money Mr. McNally and the other supervisors earned.

---

[2]Masons are skilled workmen and require little or no supervision insofar as workmanship is concerned.

**[*9]**  Petitioner stopped maintaining cash logs regarding masonry worker payments in the last quarter of 2006, which was approximately the time respondent began petitioner's tax examination.  See infra p. 10.  Although petitioner stopped recording cash outlays to the masons and laborers, its general ledger indicated that the amount of its gross receipts remained constant.

Most of the masons and laborers worked exclusively for petitioner. When a particular job was completed, the masons and laborers were let go.  If another job was in progress, Mr. McNally often invited them to join the new project if workers were needed.

Petitioner's operations were conducted in a manner that, at best, could be described as informal.  Transactions were conducted in cash and often not recorded adequately.  Petitioner had few written contracts or agreements and the documentation that did exist was incomplete and contradictory.  And it appears that regulatory filings were misleading, if made at all.

Petitioner did not pay wages as such to the Dempseys.  Instead, petitioner made multiple distributions to them and paid many of the Dempseys' personal expenses.  These distributions and expenses totaled hundreds of thousands of dollars over 2004, 2005, and 2006.

[*10]  Petitioner did not issue Forms 1099-MISC, Miscellaneous Income, or Forms W-2, Wage and Tax Statement, to the Dempseys for 2004, 2005, or 2006.  Nor did petitioner file any information returns for those years.  And the Dempseys did not timely file their Forms 1040, U.S. Individual Income Tax Return, for 2004, 2005, or 2006.

Respondent has no record of petitioner's filing any Form 1120S, U.S. Income Tax Return for an S Corporation, during the years involved.  Nor does respondent have any record of any Form 1096, Annual Summary and Transmittal of U.S. Information Returns,[3] or Form 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, filed by petitioner for any of the years or periods involved.  Petitioner filed one Form 941, Employer's Quarterly Federal Tax Return, for the fourth quarter of 2006, but respondent has no record of any others.  Respondent prepared substitutes for returns with respect to all of petitioner's unfiled information returns.

On September 26, 2006, respondent notified petitioner that it had been selected for employment tax examination.  Two weeks later (i.e., October 14, 2006), the Dempseys filed their respective Forms 1040 for 2004.  On January 19,

---

[3]This form is used to transmit paper Forms 1099, 1098, 5498, and W-2G to the Commissioner.

[*11] 2007, they filed their respective Forms 1040 for 2005. On January 4, 2007, approximately three months after respondent commenced his examination, petitioner submitted to the examining agent Form 1120S for petitioner's 2004 tax year,[4] as well as copies of a 2004 Form 1096, a Form 941 for the fourth quarter of 2006, and a Form UCT-6, Florida Department of Revenue Employer's Quarterly Report. Petitioner also provided Forms 1099-MISC for the years involved for some of the masons and laborers. For 2004 petitioner provided Forms 1099-MISC for 11 of the 30 masons and laborers whom petitioner paid $600 or more during that year; for 2005, petitioner provided Forms 1099-MISC for 9 of the 66 masons and laborers whom petitioner paid $600 or more; and for 2006, petitioner provided Forms 1099-MISC for 18 of the 46 masons and laborers whom it paid $600 or more. At trial Mr. Dempsey admitted that the information returns filed were prepared after they were due.

Respondent determined that the Dempseys failed to report the following amounts of wages from petitioner:

| Employee | 2004 | 2005 | 2006 |
|----------|------|------|------|
| Ms. Dempsey | $86,202.50 | $47,191.19 | $74,388.44 |
| Mr. Dempsey | 96,008.50 | 75,741.19 | 141,658.44 |

---

[4]Petitioner also submitted Forms 1120S for its 2002 and 2003 tax years.

[*12] Petitioner maintained a workers' compensation insurance policy which did not cover any of the masons or laborers. Petitioner never inquired as to whether any of the masons or laborers had their own insurance. It appears they did not.

Petitioner's workers' compensation insurance carrier conducted a policy audit of petitioner for the period of April 1, 2004 through 2005. The audit report named Ms. Dempsey as an employee of petitioner, Mr. Dempsey as a subcontractor, and two unrelated businesses, Forte Crane and John A. Walker & Sons, as subcontractors. It did not mention Mr. McNally, the masons, or the laborers.

OPINION

I.     The Workers' Legal Classification

Employers and employees are subject to "employment taxes", i.e., FICA and FUTA. FICA provides a Social Security tax payable by both employers and employees. See secs. 3101, 3111. FUTA provides for unemployment taxes payable by employers. See secs. 3301-3311. Employers are required to withhold FICA tax as well as Federal income tax on wage payments they make to their employees. See secs. 3102, 3402. These employment taxes do not apply to payments to independent contractors.

**[\*13]** The Commissioner's determinations are presumed correct, and taxpayers bear the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). This principle applies to the Commissioner's determination that a taxpayer's workers are employees. Boles Trucking, Inc. v. United States, 77 F.3d 236, 239-240 (8th Cir. 1996); Ewens & Miller, Inc. v. Commissioner, 117 T.C. 263, 268 (2001). If an employer-employee relationship exists, its characterization by the parties as some other relationship is immaterial. Sec. 31.3121(d)-1(a)(3), Employment Tax Regs.

As stated supra p. 3, petitioner now concedes that its corporate officers (i.e., the Dempseys) were its employees. We thus are left to decide the legal employment classification of the masons and laborers.

Whether an individual is an employee or an independent contractor is a factual question to which common law principles apply. See secs. 3121(d)(2), 3306(i); Weber v. Commissioner, 103 T.C. 378, 386 (1994), aff'd per curiam, 60 F.3d 1104 (4th Cir. 1995).[5] Guidelines for determining the existence of an employment relationship are found in three substantially similar sections of the

---

[5]The common law of employer-employee relations refers to "'the general common law of agency, rather than * * * the law of any particular state.'" Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 n.3 (1992) (quoting Community for Creative Non-Violence v. Reid, 490 U.S. 730, 740 (1989)).

[*14] regulations--sections 31.3121(d)-1, 31.3306(i)-1, and 31.3401(c)-1, Employment Tax Regs., relating to FICA, FUTA, and income tax withholding, respectively. The regulations adopt the common law definition of an employee. Under the common law, an employer-employee relationship exists when the principal has the right to control and direct the service provider, not only as to the result to be accomplished but also as to the details and means by which that result is accomplished. Secs. 31.3121(d)-1(c)(2), 31.3306(i)-1(b), Employment Tax Regs; see also sec. 31.3401(c)-1(b), Employment Tax Regs. The principal need not actually direct or control the matter in which the services are performed; it is sufficient that the principal has the right to do so. Weber v. Commissioner, 103 T.C. at 388; Twin Rivers Farm, Inc. v. Commissioner, T.C. Memo. 2012-184. Relevant factors in determining whether a worker is an employee or an independent contractor include: (1) the degree of control exercised by the principal over the details of the work; (2) which party invests in the facilities used by the worker; (3) the opportunity of the worker for profit or loss; (4) whether the principal can discharge the individual; (5) whether the work is part of the principal's regular business; (6) the permanency of the relationship; and (7) the relationship the parties believe they were creating. Ewens & Miller, Inc. v. Commissioner, 117 T.C. at 270; Weber v. Commissioner, 103 T.C. at 387. All of the facts and

[**15**] circumstances are considered, and no one factor dictates the outcome. Ewens & Miller, Inc. v. Commissioner, 117 T.C. at 270.

1.    Degree of Control

The right of the principal to exercise control over the agent, whether or not the principal in fact does so, is the "crucial test" for the existence of an employer-employee relationship. Weber v. Commissioner, 103 T.C. at 387; John Keller, Action Auto Body v. Commissioner, T.C. Memo. 2012-62. An employer-employee relationship exists when the principal retains the right to direct the manner in which the work is to be done, controls the methods to be used in doing the work, and controls the details and means by which the desired result is to be accomplished. Ellison v. Commissioner, 55 T.C. 142, 152-153 (1970).

Petitioner failed to prove that Mr. Dempsey did not control the masons' or the laborers' work.[6] The evidence reveals that petitioner, acting through Mr. Dempsey, possessed the right and requisite degree of control to establish an employer-employee relationship. Mr. Dempsey (1) had the ultimate authority in instructing the masons and laborers with respect to what they were to do, (2) had

---

[6]The examining revenue agent testified without objection by petitioner that in interviews some of the masons and laborers stated they would receive instructions relating to the masonry jobs from Mr. Dempsey. None of the masons, laborers, or supervisors other than Mr. McNally testified at trial.

**[\*16]** the right of approval as to the quality of their work, (3) set the masons' and laborers' working hours at eight hours per day, and (4) paid them for their work on a weekly basis, as opposed to at the end of the project. We are mindful that the day-to-day operations were turned over to supervisors, such as Mr. McNally. Nonetheless we are satisfied that the masons and laborers were aware that Mr. McNally was working for petitioner and that their pay came from petitioner.

Masons are skilled laborers, and the masons supervised the laborers who helped them. It was not necessary for Mr. Dempsey, or anyone else, to exercise close supervision over them. An employer need not "stand over" the employee to control an employee. Ewens & Miller, Inc. v. Commissioner, 117 T.C. at 270; Ellison v. Commissioner, 55 T.C. at 153. Nevertheless, Mr. Dempsey had the right to control the results to be accomplished and the manner in which the masons' work was to be performed. This factor weighs in favor of classifying the masons and laborers as employees.

2. Investment in Facilities

None of the parties (petitioner, masons, or laborers) had any significant investment in the facilities. Petitioner purchased all of the building materials (i.e., the concrete and the cement) and leased all of the heavy equipment (e.g., cranes and forklifts) used to construct the buildings, but it was reimbursed for the building

**[\*17]** materials and lease expenses.[7] The masons used their own tools (e.g., trowels, levels, and tape measures) to perform their task. The record is silent as to any investment in the facilities by the laborers. This factor carries no weight in determining the legal employment classification of the masons and laborers.

3.     Opportunity for Profit and Risk of Loss

The masons and laborers could not share in the profit if the project came in under budget, unlike Mr. McNally and the other supervisors. Nor could they suffer a loss if the project came in over budget.

We are mindful that piecework compensation has been considered to be an indicator of independent contractor status, see Tristate Developers, Inc. v. United States, 212 Ct. Cl. 486, 549 F.2d 190 (1977), but there is also judicial authority for classifying piecework workers as employees, see e.g., Rutherford Food Corp. v. McComb, 331 U.S. 722, 729-730 (1947) (slaughterhouse boning workers more properly considered employees in part because they were an integrated unit of production for the taxpayer). This factor weighs in favor of classifying the masons and laborers as employees.

_____

[7]The contracts between the petitioner and the general contractors provided that the materials so purchased belonged to the general contractors. See supra p. 5.

**[*18]** 4.     Right To Discharge the Workers

Employers typically have the right to terminate employees at will.[8]  Ellison v. Commissioner, 55 T.C. at 155; Twin Rivers Farm, Inc. v. Commissioner, supra. Mr. Dempsey, on behalf of petitioner, could fire any worker who did not perform to his satisfaction.  This factor weighs in favor of classifying the masons and laborers as employees.

5.     Integral Part of the Business

When workers are an essential part of the taxpayer's normal operations, we weigh this factor in favor of an employer-employee relationship.  See John Keller, Action Auto Body v. Commissioner, T.C. Memo. 2012-62; Day v. Commissioner, T.C. Memo. 2000-375.  The masons and laborers were an essential part of petitioner's business; without them, the jobs procured on petitioner's behalf could not have been completed.  This factor weighs in favor of classifying the masons and laborers as employees.

---

[8]Independent contractors also may be terminated at will.  Thus, we give some, but not great, weight to this indicia of an employer-employee relationship. See John Keller, Action Auto Body v. Commissioner, T.C. Memo. 2012-62; Lewis v. Commissioner, T.C. Memo. 1993-635 (citing Neely v. Commissioner, T.C. Memo. 1978-18).

[*19] 6.     Permanency of the Relationship

A transitory work relationship may weigh in favor of independent contractor status. Ewens & Miller, Inc. v. Commissioner, 117 T.C. at 273 (citing Herman v. Express Sixty-Minutes Delivery Serv., Inc., 161 F.3d 305 (5th Cir. 1998)). In this case, the masons and laborers were engaged by petitioner for only one job at a time. Once it was completed, the masons and laborers were free to work elsewhere. This factor weighs in favor of classifying the masons and laborers as independent contractors.

7.     The Relationship the Parties Believed They Created

There was no meaningful testimony with respect to this factor. Therefore, this factor carries no weight in determining the legal employment classification of the masons and laborers.

In sum, there are four factors weighing in favor of classifying the masons and laborers as employees, one factor weighing in favor of classifying the masons and laborers as independent contractors, and two factors which carry no weight. Giving due consideration to the totality of the facts presented, and bearing in mind that petitioner bears the burden of proving respondent's classification erroneous, we conclude that the masons and laborers should be legally classified as

**[\*20]** petitioner's employees.  Accordingly, we hold petitioner is liable for Federal employment taxes, additions to tax, and penalties as determined by respondent.

Despite our conclusion that the masons and laborers were petitioner's employees, section 530 allows petitioner relief if three requirements are satisfied: (1) petitioner must not have treated the individuals as employees for any period; (2) petitioner must have consistently treated the individuals as nonemployees on all tax returns for periods after December 31, 1978; and (3) petitioner must have had a reasonable basis for not treating the individuals as employees.  See sec. 530(a)(1); Joseph M. Grey Pub. Accountant, P.C. v. Commissioner, 119 T.C. 121, 130 (2002), aff'd, 93 Fed. Appx. 473 (3d Cir. 2004); John Keller, Action Auto Body v. Commissioner, T.C. Memo. 2012-62.

Petitioner did not file the required information returns, including Forms 1099-MISC, with respondent for any of the workers in question as required by sections 6041(a) and 6041A(a).  Therefore, not all requirements for section 530  relief have been satisfied.  Because petitioner failed to meet all of the section 530 requirements, it does not qualify for relief.  See Joseph M. Grey Pub. Accountant, P.C. v. Commissioner, 119 T.C. at 130.  In sum, we hold that petitioner is liable for the employment taxes as determined by respondent.

**[*21]** II. Section 6651 Additions to Tax and Section 6656 Penalty

Section 6651(a)(1) imposes an addition to tax of up to 25% for failure to timely file a tax return unless the taxpayer shows such failure is due to reasonable cause and not due to willful neglect.  Section 6651(a)(2) imposes an addition to tax of up to 25% for failure to timely pay the amount of tax shown on any return unless the failure is shown to be due to reasonable cause and not due to willful neglect.

If a taxpayer fails to make a required deposit on the date prescribed for that deposit, section 6656(a) imposes a penalty equal to the applicable percentage of the amount of the underpayment, determined pursuant to section 6656(b).  This penalty is not imposed if the failure to pay was due to reasonable cause and not willful neglect.

To establish reasonable cause, the taxpayer must show that he exercised "ordinary business care and prudence in providing payment of his tax liability" but nonetheless was unable to meet his obligations.  See United States v. Boyle, 469 U.S. 241, 245-246 (1985); Van Camp & Bennion v. United States, 251 F.3d 862 (9th Cir. 2001); Charlotte's Office Boutique v. Commissioner, 121 T.C. 89, 109 (2003), aff'd, 425 F.3d 1203 (9th Cir. 2005); Bruner v. Commissioner, T.C. Memo. 1998-246.

**[*22]** Petitioner has not shown reasonable cause for (1) failing to timely make the proper return filings, (2) failing to timely pay the amounts of tax shown on the returns, or (3) failing to timely make the required deposits.  Petitioner made no argument with respect to these failures except to state that it never filed its returns or paid its taxes on time.  Consequently, petitioner is liable for the section 6651(a)(1) addition to tax, the section 6651(a)(2) addition to tax, and the section 6656(a) penalty.

We have considered all of the parties' contentions, and to the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing and petitioner's concession,

Decision will be entered

for respondent.